**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARC ROTENBERG,**<br>**3230 Woodland Dr., NW**<br>**Washington, DC 20008,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**POLITICO LLC**<br>**1000 Wilson Blvd., Suite 2700**<br>**Arlington, VA 22209,**<br><br>**PROTOCOL MEDIA, LLC**<br>**1000 Wilson Blvd., Suite 2700**<br>**Arlington, VA 22209,**<br><br>**Robert ALLBRITTON**<br>**1000 Wilson Blvd., Suite 2700**<br>**Arlington, VA 22209, and**<br><br>**Tim GRIEVE**<br>**1000 Wilson Blvd., Suite 2700**<br>**Arlington, VA 22209,**<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Case No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CIVIL COMPLAINT AN DEMAND FOR JURY TRIAL

Plaintiff Marc Rotenberg, by and through undersigned counsel, files this complaint for

defamation and invasions of privacy, including public disclosure of private facts, false light torts,

and appropriation of name and likeness for commercial benefit. Defendants caused to be

published a series of articles that were malicious by intent, design, and consequence. The first

article, a fabrication constructed by Defendant Protocol Media, LLC ("The Protocol") and later

republished by Defendant POLITICO LLC ("POLITICO"), deflected attention from the chaos

and turmoil then underway at The Protocol. The Executive Editor of The Protocol, Defendant

Tim Grieve, fired 13 people—at least 10 of whom were reporters or editors—on the very same day—April 21, 2020—Defendants amplified malicious, false, and fabricated statements about Marc Rotenberg. To further distract attention from the meltdown underway at The Protocol, Defendants manufactured even more egregious statements about the Plaintiff. And Defendant Robert Allbritton and Grieve were not simply the publisher of POLITICO and executive editor of The Protocol; they were President and Vice President, of Perpetual Capital Partners, a private investment firm that benefited from the publication of the vicious caricature of one of the nation's leading privacy advocates.

Throughout the entire episode, Defendants recklessly ignored well established medical, scientific, and legal procedures for sensitive medical information, flouted the most basic journalistic standards, and put at risk the public safety efforts that the Centers for Disease Control, the DC Heath agency, and the President's top advisor on the coronavirus continue to pursue to this day.

## Jurisdiction and Venue

1.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1332, as the parties to this matter at citizens of different states, and the amount in controversy exceeds $75,000.

2.      Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

3.      This Court has personal jurisdiction over Defendants POLITICO, The Protocol, CEO Publisher and The Protocol owner Robert Allbritton, and The Protocol Executive Editor Tim Grieve because they conduct regular business in the District of Columbia, maintain regular

and systematic contacts with the District of Columbia, and because it is where the events giving rise to these claims occurred.

**Parties**

4.      Marc Rotenberg is a resident of Washington, DC, and founder and former President of the Electronic Privacy Information Center, headquartered in Washington, DC. He was a widely regarded public interest advocate, known also for personal integrity, professional expertise, and diligence.

5.      POLITICO LLC ("POLITICO") is a news corporation, incorporated in Arlington County, Virginia, that reports primarily about political events in Washington, DC. POLITICO is distributed for free in Washington, DC. According to Wikipedia, POLITICO "carries advertising, including full-page ads from trade associations and a large help-wanted section listing Washington political jobs." POLITICO routinely organizes events, charges for services, in Washington, DC. Wikipedia further identifies POLITICO as a "newspaper in Washington, DC."

6.      Protocol Media, LLC ("The Protocol" or "Protocol") operates under corporate umbrella of POLITICO CEO Robert Allbritton's Perpetual Capital Partners. The Protocol launched on February 5, 2020, approximately two months before the facts outlined in this complaint occurred. Protocol has offices in "the same building as Politico, at 1000 Wilson Blvd. in Rosslyn."[1]

7.      Robert L. Allbritton, who is also the executive chairman of D.C.-based private equity firm Perpetual Capital Partners LLC, is the owner of Capitol News Company LLC, the

---

[1] Andy Medici, *Politico owner rolls out new tech-focused media venture,* Washington Business Journal (Nov. 13, 2019), https://www.bizjournals.com/washington/news/2019/11/13/politico-owner-rolls-out-new-tech-focused-media.html

Arlington-based holding company that is the parent organization of POLITICO.[2] According to a 2013 press release announcing the formation of Perpetual Capital Partners, "The firm will target investments in the media and communications, distribution, branded products and business services industries."[3]



*Figure 1 - Vanity Fair article about The Protocol (Nov. 12, 2019)*

[2] Katishi Maake, *Report: Politico publisher Robert Allbritton launching new outlet covering tech, Washington Business Journal* (Mar. 20, 2020), https://www.bizjournals.com/washington/news/2019/03/20/report-politico-publisher-robert-allbritton.html
[3] Perpetual Capital Partners, *Robert Allbritton announces the formation of Perpetual Capital Partners, a private investment firm* (May 13, 2013), https://www.perpetualcapitalpartners.com/about/press-releases/press-release-051313.html

8.     Tim Grieve is the Executive Editor of The Protocol. Grieve received approximately $10 million from Allbritton in 2019 to start The Protocol.[4] Tim Grieve is also Vice President of Perpetual Capital Partners.[5]

**Factual Allegations**

9.     Until an article appeared in The Protocol, on April 16, 2020, Marc Rotenberg was a widely regarded expert in privacy law and Internet policy, respected also for his personal integrity and judgement. He had testified before the US Congress more than sixty times, filed dozens of amicus brief in the US Supreme Court on emerging privacy issues, coauthored three casebooks on privacy law, and received numerous awards for professional achievement, management,  and ethics. He was the president the Electronic Privacy Information Center (EPIC), an organization he founded in 1994, one of the most well regarded privacy organizations in the world.

10.     The article that led to the dismissal of Marc Rotenberg by EPIC was malicious by design, intent, and consequence. Almost every sentence in the article, as well as the headline, was written with malicious intent.

11.     Grieve published the article in the midst of controversy, turmoil, layoffs, and staff stress at The Protocol, entirely unrelated to Marc's conduct at EPIC.

12.     The Protocol article reflected the vindictiveness of a former employee of EPIC, the recklessness of Protocol Executive Editor Tim Grieve, and ultimately the reckless collaboration of Protocol's parent publisher POLITICO.

---

[4] Joe Pompeo, *"I Would Love for this to be as Big as Politico": Politico's Founder is a Launching a Tech Site – Into a Very Crowded Market,"* Vanity Fair, Nov. 12, 2019.
[5] Zoominfo, *Tim Grieve, Vice President at Perpetual Capital Partners*, https://www.zoominfo.com/p/Tim-Grieve/238192558

13.     The article that followed on April 21, 2020 in the parent news organization POLITICO, championing the prior defamatory article in The Protocol, amplified the disinformation and malice The Protocol had manufactured.

14.     The Protocol itself, on April 21, 2020, piled new defamations on its earlier defamatory statements.

15.     The articles were maliciously intended to deflect attention from Allbritton and Grieves' decision to fire nearly half the news staff at The Protocol.

16.     All three articles contained numerous errors of fact, along with misleading and defamatory statements.

17.     All three articles purposefully disregarded well established medical, scientific, and legal standards for the protection of sensitive medical information.

18.     All three articles were defamatory and tortious.

19.     All three articles embody the disregard for accuracy, the recklessness of news organizations, and the willingness to publish false and malicious content to generate revenue that has diminished the value of news across the Internet.

20.     The articles were particularly egregious as Grieve and Allbritton specifically sought to create a smokescreen for their own poor treatment of their staff during the early days of the pandemic.

21.     POLITICO's malicious and reckless conduct had immediate and lasting impact on Marc Rotenberg, his reputation, and his family, and is therefore actionable and is the basis for the legal remedies that this Court should order.

### The Protocol

22.     In November 2019, POLITICO CEO Robert Allbritton announced the creation of a news organization. He told Vanity Fair that The Protocol will "look at technology as a base of power."[6]

23.     As the Vanity Fair reporter Joe Pompeo observed at the time, "It seems a heavy lift, given the number of tech sites that have flowered (and sometimes partially wilted) over the past decade or so."

24.     And as Sarah Scire and Joshua Benton described for the Neiman Lab on the day The Protocol launched, "journalism has faced plenty of criticism that had little to do with partisanship. Its breakneck pace; its *bloodlust for scoops*; its dedication to the most insular sort of savvy insiderness—all of these have been subject to deep critique, sometimes from the very people who helped shape it."[7]

25.     Scire and Benton, like Pompeo in *Vanity Fair*, noted the enormous competitive challenges facing The Protocol.

---

[6] Joe Pompeo, *"I would love for this to be as big as POLITICO: POLITICO's founder is launching a teach site – into a very crowded market,"* Vanity Fair (Nov. 12, 2019), https://www.vanityfair.com/news/2019/11/politico-founder-is-launching-a-tech-site

[7] Sarah Scire and Joshua Benton, *Protocol — think Politico, but for tech — launches into a crowded space,* Niemann Lab (Feb. 5, 2020) (Emphasis added), https://www.niemanlab.org/2020/02/protocol-think-politico-but-for-tech-launches-into-a-crowded-space/

# Protocol — think Politico, but for tech — launches into a crowded space

"Technology is no longer just a sector of the economy or an industry — it's a global power center akin to any nation's capital. And it's time for a publication to cover it like one."

*By* **SARAH SCIRE AND JOSHUA BENTON**    Feb. 5, 2020, 3:58 p.m.

*Figure 2 - Nieman Lab article about The Protocol (Feb. 5, 2020)*

26.    Scire and Benton noted a widely tweeted critique of insider journalism by Buzz Feed News Editor in Chief Ben Smith (@benyt). Smith wrote, "I got a job as part of the launch of Politico, conceived unapologetically as a "'needle in the vein of political junkies.'"[8]

27.    Allbritton hired Tim Grieve as Executive Editor for The Protocol.

28.    An "Executive Editor" has broad authority for all publishing and management decisions at a news organization, including hiring and firing. According to a leading source for jobs in the news industry:

> An executive editor organizes, supervises, and participates in the management and development of all copy submitted for publication. An executive editor works with editors and designers on the development of the editorial calendar and sets and enforces deadlines for copy. An executive editor consults with editors, designers, and publishing managers on content for each issue, provides evaluations of manuscripts to editors, and supervises the submission process and tracking system. An executive editor conducts negotiations with writers and agents, issues and records contracts with writers and agents, and ensures that timely payments are made to the contributors. An executive editor

---

[8] Ben Smith, *I Helped Create Insider Political Journalism. Now It's Time For It To Go Away*, BuzzFeed News (Aug. 30, 2018), https://www.buzzfeednews.com/article/bensmith/i-helped-create-insider-political-journalism-now-its-time

maintains liaisons between the author, associate editor, and copy editor; compares editorial changes to the author's changes; and keeps the author up to date on schedules, revisions, and related matters. An executive editor directs and coordinates the work of consulting editors and reports their comments to the copy editors. An executive editor prepares operational reports and analyses setting forth progress, adverse trends, and appropriate recommendations or conclusions. An executive editor recommends various personnel actions relating to hiring, performance appraisals, promotions, transfers, and vacation schedules.[9]

29.    Most critically, an Executive Editor supervises editorial content.[10]

30.    Under Tim Grieve, the Protocol quickly fell into controversy. An investigative article by Steven Perlberg in *Digiday* that appeared just a few months after the acts that gave rise to this complaint, described a news organization in chaos.[11]

# DIGIDAY



NEWS ▾        DIGIDAY +        PODCASTS        EVENTS        AWARDS

MANAGING THROUGH CRISIS

## 'Hug them close and punch them in the nose': How upstart Protocol, eager to get inside crowded tech beat, struggled and cut to survive

*Figure 3 - Digiday article about The Protocol (July 20, 2020)*

---

[9] Publishing Crossing, *Executive Editor Jobs Description* (viewed March 28, 2021), https://www.publishingcrossing.com/job-description/5124/Executive-Editor-Jobs/
[10] Zippia, *Executive Editor: What They Do* (viewed March 28, 2021) ("An executive editor supervises the editorial content of magazines, newspapers, or other publications."), https://www.zippia.com/executive-editor-jobs/what-does-an-executive-editor-do/; Tonya Whitaker, Executive Editor Job Description, Career Trend (Oct. 25, 2019) ("Executive editors are the individuals who oversee the editorial content of a newspaper, magazine or other type of publication."), https://careertrend.com/about-5336656-executive-editor-job-description.html.
[11] Steven Perlberg , *'Hug them close and punch them in the nose': How upstart Protocol, eager to get inside crowded tech beat, struggled and cut to survive* (July 20, 2020), https://digiday.com/media/hug-them-close-and-punch-them-in-the-nose-how-upstart-protocol-eager-to-get-inside-crowded-tech-beat-struggled-and-cut-to-survive/

31.     According to Perlberg, in April 2020 the Protocol was collapsing, "With advertising budgets contracting, the pandemic had an acute effect on media businesses, which, despite an ironic growth in traffic given the public interest, were heading for furloughs, buyouts and layoffs." In mid-April, Perlberg explains:

> Staffers pressed Protocol executive editor Tim Grieve and president Tammy Wincup on the state of the company. The site was two months old, but facing growing pains. Thanks to above-market salaries and the relative comfort of a wealthy backer, Washington, D.C.-based media mogul Robert Allbritton, Protocol had lured alumni of Wired, The New York Times and the Wall Street Journal. . . . On the video conference, staffers were told that, despite advertisers acting slower to make commitments, everything was fine.

> Shortly thereafter, however, Protocol laid off 13 employees across the editorial and business sides, reducing the newsroom size by about half. Four of those forced out were people of color, leaving the already non-diverse Protocol almost entirely white.

32.     If Perlberg's reporting is accurate, Protocol Executive Editor Tim Grieve had lied to the Protocol staff when he said that "everything was fine" just before he fired nearly half the staff in the newsroom.

33.     On April 21, 2020, Executive Editor Tim Grieves fired respected former Wired report Emily Dreyfus (@EmDreyfus). Dreyfus was a 2018 Nieman-Berkman Klein Fellow in Journalism Innovation at Harvard University, and previously worked at CNET as a senior editor. She also served as a senior programming manager at CBS Interactive.[12]

---

[12] Mariam Ahmed, *Three additional staff disclose layoffs at Protocol*, Talking Biz News (Apr. 22, 2020), https://talkingbiznews.com/they-talk-biz-news/three-additional-staff-disclose-layoffs-at-protocol/

# Three additional staff disclose layoffs at Protocol

BY **MARIAM AHMED** · APRIL 22, 2020

**Emily Dreyfuss**, editorial director at Protocol, is among the 13 staff members laid off by the company. She writes:



> *"To say I'm heartbroken would be an understatement. I joined the company with the plan to build something and stay for a very long time."*



*Figure 4 - Talking Biz News about The Protocol (Apr. 22, 2020)*

34.     Dreyfus told Talking Biz News, "To say I'm heartbroken would be an understatement. I joined the company with the plan to build something and stay for a very long time."

35.     Grieve also fired Managing editor Joanna Pearlstein (@jopearl). She joined the media company from Wired where she held the post of deputy editor. She has also worked at Red Herring as a news editor and served as a senior editor at MacWeek. Pearlstein is a B.A. in English from Vassar College.

36.     And Grieve fired cybersecurity reporter Adam Janofsky (@AdamJanofksy). Previously, Janofsky worked as a reporter for The Wall Street Journal. Janofsky holds a bachelor's degree in political science and law from University of Chicago. Before that, he was a

video journalist at Inc. magazine, and had interned at Bloomberg covering corporate finance and credit markets. He also served as editor-in-chief at Chicago Maroon.

37.     Janofsky wrote on Twitter: "When I joined the founding team last year, I was excited about building something to last. I'm heartbroken it got cut short, but grateful that I got to work with so many talented journalists." (Apr. 22, 2020)

38.     Grieve also fired Hayden Field (@haydenfield), an accomplished reporter, currently with Emerging Tech Brew.

39.     Kerry Flynn (@kerrymflynn), tweeted (on April 23, 2020) "If Protocol's owner was genuinely committed to its 'mission and long-term opportunity,' why wouldn't he keep some of those 13 people around by putting them on paid leave, or cutting salaries enough to meet short-term goals?"

40.     There is no indication that Grieve conducted any formal review or evaluation of the experienced reporters he summarily dismissed, just a few months into the launch of his new publication with the 10 million dollars from Robert Allbritton.

41.     The journalists who tweeted about the episode all described surprise about how the events unfolded.

42.     Reporters concerned that there might be layoffs would have been under enormous pressure to write articles that could be considered a "scoop" by Grieve, not only to drive up advertising revenues and reassure the investor Allbritton, but also to save their jobs.

43.     Grieve was already famously known for the overhaul of the news conglomerate, McClatchy News. At McClatchy, Grieve reimagined news "through the prism of what the audience wants."[13]

---

[13] Rowan Moore Gerety, *Steadying the Miami Herald newsroom, after cuts and a digital reinvention*, Columbia Journalism Review (June 8, 2018), https://www.cjr.org/united_states_project/miami-herald-clickchain-jobs.php

44.     According to a 2018 article in Columbia Journalism Review, Tim Grieve, then Vice President of News at McClatchy  "unveiled newsroom reinvention plans."

45.     As described a year earlier in Poynter, with Grieve's newsroom reinvention plans "There will be talk of digital best practices, but the heart of the exercise is a look at how well a collection of your recent stories performed online. Which ones were hits? Which ones bombed? . . . And drop the dull stuff. Lots of boring stories don't do much for the reader or the company's bottom line."[14]

46.     The 2017 Poynter report continues:

So far it's working, said Tim Grieve, vice president of news for McClatchy, who's five months into a new program to pick up the pace of digital transformation.

"We run about 29,000 pieces of local digital content a month," company-wide, Grieve said, "and 1,000 of those drive more than half the readership. That's about one story per day per newsroom. If we could do two a day instead, we could double (that part of) the traffic."

47.     A few other highlights from the Grieve newsroom reinvention plans, as reported by Poynter, provided further insight into the strategy to "reinvent" the newsroom:

A deep story with a strong personality element will be the biggest audience engagement winner, Grieve continued.

While story selection is key, stronger SEO, inviting headlines and the like are also driving growth in digital engagement, Grieve said.

48.     Grieve left McClatchy in 2018, after receiving a reported $557,284 from the news company the previous year, for a "new media Venture."[15]

---

[14] Rick Edmonds, *Inside McClatchy's plan to reinvent its newsrooms,* Poynter (June 19, 2017), https://www.poynter.org/business-work/2017/inside-mcclatchys-plan-to-reinvent-its-newsrooms-update/
[15] Salary.com, *Tim Grieve, Vice Presidents,* https://www.salary.com/tools/executive-compensation-calculator/tim-grieve-salary-bonus-stock-options-for-mcclatchy-co-cl-a?year=2017; Scott Berson, *McClatchy's head of news Tim Grieve leaves company for new media venture,* Miami Herald (Oct. 26, 2018), https://www.miamiherald.com/latest-news/article220660975.html

49.     McClatchy's revenue continued to fall sharply in 2018 and 2019.



*Figure 5- Revenue Generated by the McClatchy Company from 2011 to 2019 (Statista 2021, derived from McClatchy Form 10-K, page 18)*

\* \* \*

50.     Perlberg, whose work has appeared in the *Wall Street Journal, BuzzFeed News, Vanity Fair, Fortune, Digiday, Politico Magazine, Business Insider,* and other publications. wrote after the firings at The Protocol, "Now, the outlet is an even-smaller player in the incredibly crowded tech journalism ecosystem, *building an ad-based business in a harsh ad market and competing for scoops with national publishers* . . .This story is based on interviews with more than a dozen current and former Protocol staffers and people familiar with its leadership and development. Collectively, they paint a picture of an ambitious operation full of early struggles, in part due to coronavirus but also of the company's own making." (emphasis added)

51.     According to Perlberg, "Grieve highlighted some of the work he is most proud of in Protocol's short history: . . .a *scoop* about the president of the Electronic Privacy Information Center failing to quarantine after taking a coronavirus test which came back positive (he later resigned) . . . ." (emphasis added)

52.     The statement by the Protocol Executive Editor Tim Grieve—recounted by Perlberg, which is still available at the websites of POLITICO and The Protocol—was twice false and malicious. First, contrary to Grieve's implication that Marc was told by any doctor or public health authority to quarantine, Marc was not told to quarantine after he took a coronavirus test. Second, Marc did not resign. It was the publication of the Protocol article that led to Marc's dismissal.

53.     In the interview with Perlberg, Grieve emphasized the readership he had generated.  "Protocol is too young to generate comScore traffic figures, but Grieve said that it has reached more than 3.5 million readers in less than five months."

54.     Perlberg elsewhere in the article wrote that "People who worked with Grieve at the time said he embodied the kind of macho attitude that characterized the early days of Politico. He had a reputation euphemistically described by the media press at the time as 'hard-charging' or 'combustible.'"

55.     As Perlberg recounts in the report on The Protocol, "As launch approached, Protocol staffers started to doubt whether they could mirror the playbook of Politico, which created daily characters out of people who were inherently public: White House officials, members of Congress, lobbyists and legislative aides. No *scoop* was too small for Politico, especially during its first few years, and Washington sources with clear agendas happily whispered in reporters' ears." (Emphasis added).

56.     Just five days after The Protocol published the malicious and defamatory story about Marc Rotenberg, the news organization laid off 13 staff members. According to the Neiman Lab article, "This afternoon, Protocol announced it was laying off 13 staffers, an astonishingly quick turnaround and a sign of how hard coronavirus is hitting even media companies that seemed set for the long haul. . . . The 13 layoffs come from 'across the editorial and business teams.' Protocol's staff page listed 35 people this morning."[16]

## Nieman**Lab**

ABOUT

BUSINESS MODELS | MOBILE | AUDIENCE | AGGREGATION | REPORTING

# Protocol, 11 weeks into life, is already laying off a big chunk of its staff

**LINK**: TWITTER.COM ↗ | **POSTED BY**: JOSHUA BENTON | APRIL 21, 2020

*Figure 6 - Nieman Lab article about The Protocol (Apr. 21, 2020)*

57.     The Nieman Lab article quotes a staff memo from publisher Robert Allbritton, president Tammy Wincup, and Executive Editor Tim Grieve in which they state, "The coronavirus has done nothing to shake our faith in Protocol's mission or our long-term

---

[16] Joshua Benton, *Protocol, 11 weeks into life, is already laying off a big chunk of its staff* (Apr. 21, 2020), https://www.niemanlab.org/2020/04/protocol-11-weeks-into-life-is-already-laying-off-a-big-chunk-of-its-staff/

opportunity, but there's no denying that the pandemic has profoundly changed the economic realities of the present."

58.     The Nieman Lab author Joshua Benton (@jbenton) writes "I have to say I find this curious on a number of levels," and then describes several ways in which the memo from Allbritton, Wincup and Grieve failed to explain the decision to suddenly and abruptly fire one-third of The Protocol's staff.

59.     Benton writes, "You go through the trouble of recruiting and hiring these folks, pay them through six months of planning, and then let them go 11 weeks into publishing? It all just feels…odd, and not entirely COVID-inspired."

60.     Chris Roush at Talking Biz News also picked up on the controversy at The Protocol.[17]

---

[17] Chris Roush, *Why the Protocol layoffs don't make business sense,* Talking Biz News (Apr. 22, 2020), https://talkingbiznews.com/they-talk-biz-news/why-the-protocol-layoffs-dont-make-business-sense/



Home | They Talk Biz News | We Talk Biz News | Jobs in Biz News | Biz Journalism Lists | Submit job change

# Why the Protocol layoffs don't make business sense

BY CHRIS ROUSH · APRIL 22, 2020

**Joshua Benton** of Nieman Lab writes about why the 13 layoffs at technology news site Protocol are curious.

Benton writes, "Protocol is, unlike most digital media companies, not overly reliant on ad revenue. ('I know, maybe more than a lot of people, just how difficult it can be to rely on advertising alone in a digital space,' Grieve told us in February.) Advertising revenue has taken a brutal hit, but one would



SHARE









*Figure 7 - Talking Biz News article about The Protocol (Apr. 22, 2020)*

61.     There is even more to the story about Tim Grieve. Media reporter Matthew

Ingram (@matthewi) wrote an expose about the episode in the Columbia Journalism Review.[18]

Ingram reported "This week, Protocol laid off 13 of its employees, according to one report, and it

appears that more than three-quarters of that total—or 10 staff in all—were reporters and editors.

The site's entire complement of editors and reporters numbered about 25 before the layoffs,

---

[18] Matthew Ingram, *Protocol layoffs raise some troubling question*, Columbia Journalism Review (Apr. 23, 2020), https://www.cjr.org/the_media_today/protocol-layoffs.php

according to Protocol's About page, which means that Allbritton just laid off almost half of the site's newsroom."



*Figure 8 - Columbia Journalism Review article about The Protocol layoffs (Apr. 23, 2020)*

62.     Ingram observed, "What's confusing about the layoff decision, given this statement, is the finality of it. Many companies have put their staff on furlough, which implies that they will be able to come back once the economic downturn starts to recede. If *Protocol*'s owner was genuinely committed to its 'mission and long-term opportunity,' why wouldn't he keep some of those 13 people around by putting them on paid leave, or cutting salaries enough to meet short-term goals?"

63.     But Ingram made a further point, "Along with all the usual expressions of dismay and sympathy from other journalists on Twitter about the layoffs, there was a strong undercurrent of bitterness. Why? Because this isn't the only round of sudden layoffs that has taken place at an Allbritton-owned digital news startup."

64.     Allbritton, in fact, had a long history of deep and sudden cuts in news

organizations.

65.     Mandy Jenkins (@mjenkins), among others, recalled Allbritton's abrupt decision

to cancel TBD, a promising news site that focused on local news in Washington, DC, detailed in

an earlier article in Columbia Journalism Review.[19]



*Figure 9 - Mandy Jenkins tweet about The Protocol layoffs (Apr. 21, 2020)*

66.     Heidi Moore (@moorehn), previously a reporter with The Guardian and the Wall

Street Journal, and currently New York bureau chief for @financialnews and @marketplace,

picked up on the money Allbritton gave Grieve to launch The Protocol.

---

[19] Lauren Kirchner, *Q & A: Jim Brady on the Death of TBD: "It was never about us making an insane amount of money by doing hyperlocal."* Columbia Journalism Review, (Feb. 25, 2011), https://archives.cjr.org/the_news_frontier/q_a_jim_brady_on_the_death_of.php



*Figure 10 - Heidi Moore tweet about The Protocol layoffs (April 21, 2020)*

67.     As BuzzFeed opinion editor Tom Gara (@tomgara) put it on Twitter, cited in the

CJR story but since deleted, "Poaching away a bunch of reporters from steady gigs elsewhere

and then firing them within a few weeks of an economic downturn is just disgraceful, and would

make me think twice about ever working for them."

There's no way we can see inside *Protocol*, or inside Allbritton's other investments (his family sold their TV stations for close to $1 billion in 2013), to see what the coronavirus downturn has done to cash flow. But letting go of that many people so soon after launching a site certainly doesn't bode well or send a great message to those who remain employed there. As BuzzFeed opinion editor Tom Gara put it on Twitter: "Poaching away a bunch of reporters from steady gigs elsewhere and then firing them within a few weeks of an economic downturn is just disgraceful, and would make me think twice about ever working for them."

*Figure 11 – Columbia Journalism Review quotation of Tom Gara tweet about layoffs of The Protocol (Apr. 23, 2020)*

 **Tweet**

---

# Sorry, that page doesn't exist!

Why not try a search to find something else?

*Figure 12 – Twitter image for Tom Gara's tweet highlighted in Columbia Journalism Review article and subsequently deleted, https://twitter.com/tomgara/status/1252698347212804106 (viewed Mar. 28, 2021)*

68.     One of the few people to survive the massive cuts at the Protocol was Issie Lapowksy, a senior reporter hired from Wired. At Wired, Lapowsky covered "the intersection of tech, politics, and national affairs." Lapowsky previously covered startups and small business as

a staff writer for Inc. magazine, and before that she worked for the New York Daily News. Prior to joining The Protocol, Lapowsky wrote many substantive stories about the tech industry.

69.     As Allbritton and Grieve were planning to fire nearly half the news staff at The Protocol, Grieve, the Executive Editor at The Protocol, supervised, supported, and facilitated Lapowsky, the recently hired journalist, in reporting on and publishing a news story that was outrageous, malicious, false, and misleading.

70.     Even the true statements were cast in a false light so as to mislead the reader.

71.     Grieve would later crow about the "scoop" that The Protocol had manufactured, citing it is as one of the few attention-grabbing stories he published as his fledgling news organization was collapsing in the middle of April 2020

72.     The April 16, 2020 article was filled with false, defamatory, and malicious statements, and violated multiple privacy rules. It ignored all relevant scientific, medical, and legal practices for the protection of sensitive medical information. The publication was reckless, and as others would describe at the time "vindictive." It is the reason for this complaint.

73.     At the time of the filing of this complaint, the Protocol website identifies Robert Allbritton and Tim Grieve as the Executive Editor.

**Protocol Leadership**


**Robert Allbritton**
Publisher


**Tammy Wincup**
President


**Tim Grieve**
Executive Editor
tim@protocol.com


**Bennett Richardson**
General Manager

*Figure 13- "Protocol Leadership" (viewed Mar. 30, 2021)*

**Mary Stone Ross**

74.     Mary Stone Ross joined EPIC on January 1, 2020 as Associate Director.

75.     During the probation period, established for all new employees at EPIC, Marc determined that Ross lacked the ability to fulfill her responsibilities. She was frequently unavailable for meetings. She was unable to complete basic tasks that other members of the EPIC staff routinely completed.

76.     Marc Rotenberg terminated Mary Stone Ross on March 31, 2020, effective April 15, 2020, with the full support of the EPIC Executive Committee, which included the EPIC Board Chair Anita Allen, the EPIC Secretary Harry Lewis, and the EPIC Treasurer Pablo Molina. The EPIC Executive Committee represented the EPIC Board of Directors in management decisions.

77.     Marc and EPIC provided to Ross the most generous severance arrangement in the 25-year history of EPIC.

78.     Marc also offered to help Ross launch a new privacy organization in California with an initial contribution from the EPIC Public Voice Fund, and a future coordinated fundraising plan.

79.     At the time of her departure, Marc believed that he and Ross had parted on good terms.

80.     But Mary Stone Ross had a plan.

81.     Ross contacted her friend at The Protocol, Issie Lapowsky.

82.     Ross had previously contacted Issie Lapowksy regarding her prior employer Alistair MacTaggart, the director of the Californians for Consumer Privacy.

83.    CCP is a leading consumer privacy organization that subsequently helped enact Proposition 24. That ballot initiative updated and expanded privacy protections for California consumers.

84.    As Marc later learned, Ross was fired from Californians for Consumer Privacy for incompetence.

85.    As Marc later learned, while at CCP, Ross had sent to her supervisor manipulated versions of email communications with key supporters of the consumer privacy organization to the detriment of the organization and MacTaggart.

86.    As Marc later learned, at the instigation of Ross, who is quoted in the article, Lapowsky authored an article in The Protocol, when the publication launched, critical of MacTaggart, Ross's former employer.[20]

87.    After Ross was fired from EPIC, she again approached Lapowsky to publish a defamatory article about the Executive Director of an organization from which she had been dismissed.

88.    Lapowsky and her editors at The Protocol knew that their originating source was acting with malicious intent or they acted with reckless disregard of the source's malicious intent.

**The First Protocol Article (April 16, 2020) was False and Malicious**

89.    On April 16, 2020 the day after Ross was fired from EPIC, Lapowsky published in The Protocol a false, malicious, and defamatory article about Marc Rotenberg, the director of the organization from which she had again been fired. Issie Lapowsky, *EPIC is in turmoil after*

---

[20] Issie Lapowsky, *Inside the closed-door campaigns to rewrite California privacy law, again: How Google, Facebook, the EFF and others lobbied Alastair Mactaggart — and what they managed to get,* The Protocol (Feb. 6, 2020), https://www.protocol.com/inside-california-privacy-law-redo

*its president took a coronavirus test without telling staff. It came back positive.* The Protocol, (Apr. 16, 2020) (See Exhibit 1).

90.     The "turmoil" was manufactured by Mary Stone Ross, the originating source of the story authored by Issie Lapowsky, and embellished, published, and promoted by The Protocol's Executive Editor Tim Grieve.

91.     The Protocol article is replete with false, misleading, and defamatory statements.

92.     When Issie Lapowsky contacted Marc Rotenberg prior to publication of the article with a detailed list of bullet points, Marc knew immediately the source of the allegations.

93.     Marc, who knew Issie from prior unrelated reporting on privacy issues, responded by email "Hi, Issie, Is this really what Mary wants to do? Regards, Marc." When Issie pressed further for a response, Marc replied "Hi, Issie, I think I said what needed to be said. Regards, Marc."

94.     Lapowsky falsely reported in the April 16 article, "Asked to comment, Rotenberg responded by accusing a former staff member of leaking the story to Protocol."

95.     That sentence, like virtually every other sentence in the article, was not true.

96.     The Protocol article contained more than a dozen statements that were untrue, false, misleading, malicious, and defamatory or contorted true facts so that a negative inference could be drawn (the "false light" tort.)

97.     The Protocol article falsely stated, for example, that Ross had "resigned." Ross had been fired.

98.     The Protocol article also falsely stated that "several employees resign[ed]."

99.     Apart from Ross's termination, there was only one other person who left EPIC during this time, and it was long planned, and with Marc's full support as both were unable to resolve an issue with another staff member at EPIC.

100.     Nobody at EPIC resigned because of Marc's conduct during this period, contrary to the article's implication to the contrary.

101.     The Protocol article falsely stated that Marc "acknowledged in a memo to his staff and his board that he should have quarantined and alerted his staff that he was taking a coronavirus test on March 9 . . ."

102.     That statement is also not true. Marc's memo to staff, which expresses concern for possible lack of empathy in the early days of the pandemic, (1) does not say Marc should have quarantined or that he violated any medical or public health direction to quarantine; or (2) that Marc should have alerted staff that he was taking a test for coronavirus.

103.     Both statements are fabrications and contrary to fact, medical advice, and the content of the memo then in the physical possession of both the reporter Issie Lapowsky and the Executive Editor Tim Grieve. They are beyond malicious and defamatory.

104.     The Protocol also stated that Marc "worked alongside them for two days." Almost every word in that sentence is false—and in this context—malicious. Marc had no physical contact with any staff members. EPIC is located in a five-story townhouse; every staff member, including Marc, has their own office.  The use of "alongside" maliciously conveyed the image that Marc worked in close physical proximity to other members of the EPIC staff.

105.     The Protocol further "reported" that some EPIC employees say that Marc "put their safety at risk, but also undermined their organization's resistance to invasive coronavirus surveillance."

27

106.     As to Marc putting others at risk, that statement is twice false. First, as EPIC Chair Anita Allen would later state, at all times Marc followed the medical advice he received. Second, as the leader of a privacy organization, he had a professional obligation to uphold privacy practices for contract tracing. It is absurd—and in this context malicious—to suggest that a privacy organization undermines its mission when it attempts to comply with well-established practices for the protection of sensitive medical information.

107.     The statement also falsely and maliciously suggested that, as a manager, Marc acted irresponsibility and without regard to the interests of EPIC.

108.     In fact, Marc was in the office to ensure bills were paid (including staff salaries) and key management materials for the organization were updated.

109.     The Protocol article maliciously attacked Marc for doing his job as Executive Director of EPIC, then one of the nation's leading privacy organizations.

110.     On information and belief, Ross is anonymously quoted in the article: "'He's out there saying privacy trumps surveillance,' said one former employee [Ross] who worked there at the time. 'Every time he opens his mouth, what runs through my head is: We need more surveillance.'"

111.     Again, one sentence contains two false, defamatory and malicious statements. First, Marc never said "privacy trumps surveillance." Marc's entire life work—reflected in testimony for the US Congress, amicus briefs for federal courts, academic articles, and public speeches—has focused on non-zero-sum outcomes for privacy.

112.    Marc had also served as an expert for several panels of the National Academies of Sciences with the explicit goal of developing privacy-protecting measures for the federal government.[21]



# Report Offers Guidance to Federal Government on Creating a New Statistics Entity to Combine Data From Multiple Sources While Protecting Privacy

News Release | October 2, 2017

*Figure 14- National Academies press release regarding recommendation to combine data across federal agencies while protecting privacy (Marc Rotenberg served as one of the expert panel members).*

113.    Simply stated, Marc would always look for approaches to achieve the stated goal and protect privacy.

114.    And that is also almost precisely the view expressed about the pandemic and privacy by now President Joe Biden in April 2020, *the week before The Protocol article appeared*. As then-candidate Biden wrote, "there needs to be widespread, easily available and prompt testing—and a *contact tracing strategy that protects privacy."[22]*

115.    Marc Rotenberg, on behalf of EPIC, literally cited the President's comment above in a detailed statement to the House Committee on Energy and Commerce on April 15, 2020

---

[21] See, e.g., The National Academies, *Report Offers Guidance to Federal Government on Creating a New Statistics Entity to Combine Data From Multiple Sources While Protecting Privacy* (Oct. 2, 2017), https://www.nationalacademies.org/news/2017/10/report-offers-guidance-to-federal-government-on-creating-a-new-statistics-entity-to-combine-data-from-multiple-sources-while-protecting-privacy
[22] Joe Biden, *My Plan to Safely Reopen America,* N.Y. Times, April 12, 2020. (emphasis added), https://www.nytimes.com/2020/04/12/opinion/joe-biden-coronavirus-reopen-america.html

regarding the protection of medical privacy amidst efforts to combat the spread of the novel coronavirus.[23]

116.    Marc wrote, "Former vice president Joe Biden has correctly said 'there needs to be widespread, easily available and prompt testing—and a contact tracing strategy that protects privacy.'"

117.    Marc also cited the remarks of Dr. Michael Ryan of the World Health Organization, a leading spokesperson for the organization battling the pandemic, who repeatedly emphasized the need to protect privacy.

118.    Marc wrote:

It is essential that government agencies and private companies implement standards that safeguard privacy. As Dr. Michael Ryan of the World Health Organization has stated, there is a "tremendous amount" of innovation and enthusiasm for new products. But he also cautioned that "when collecting information on citizens or tracking their movements there are always serious data protection and human rights principles involved."[24] Dr. Ryan said, "we want to ensure that all products are done in the most sensitive way possible and that we never step beyond the principles of individual freedoms and rights."

119.    In the statement for Congress, also signed also by EPIC Policy Counsel Caitriona Fitzgerald and EPIC Senior Counsel Alan Butler, Marc wrote, "This moment provides a unique opportunity to show that privacy and public health are complimentary goals and to establish that Privacy Enhancing Techniques can be deployed to serve the public interest and protect individuals."

---

[23] EPIC Executive Director Marc Rotenberg statement to The Honorable Frank Pallone, Chair, and The Honorable Greg Walden, Ranking Member, U.S. House Committee on Energy and Commerce, April 15, 2020, https://epic.org/testimony/congress/EPIC-HEC-Contact-Tracing-Apr2020.pdf

[24] Remarks of Dr. Michael Ryan, World Health Organization, *Daily Brief* (Mar. 25, 2020), https://epic.org/privacy/covid/who/march25remarks.mp4; *See also*, EPIC, *WHO Advisor – "We Should Never Step Beyond Individual Freedoms* (Mar. 26, 2020),; EPIC, *World Health Organization Again Speaks Up for Data Protection* (Mar. 27, 2020), https://epic.org/2020/03/world- health-organization-agai.html (As cited in the original statement).

120.    This is precisely the point that The Protocol maliciously sought to obscure: the fact that public safety and privacy protection are complimentary goals, a view expressed by leading medical organizations, including the CDC and the WHO, and the current President of the United States.

121.    The Protocol statement above also wrongly suggests that Marc could fulfill his responsibility as director of one of the nation's leading privacy organizations by simply supporting unchecked surveillance. That is also an absurd—and this context malicious— statement.

122.    The Protocol further "reported" that in an email to staff Marc, "did not mention that his COVID-19 test had come back positive that very morning."

123.    That statement presumes an action—namely, revealing the identity of individuals who had tested positive for coronavirus—that is directly contrary to widely established practices for public safety.

124.    For The Protocol to publish this statement, Grieve would have had to recklessly ignore all of the relevant scientific and medical information concerning the disclosure of the identity of a patient's medical diagnosis.

125.    This scientific and medical information was, and is, readily available on the Internet.

126.    The Protocol's flair for defamation posing as objective reporting is almost unparalleled in modern journalism. Lapowsky writes, "Marc told them he'd returned from Milan on Feb. 22, and registered a temperature of 99.5 on March 1. At the time, that was still below what the Centers for Disease Control considered to be a symptom," as if to suggest that there was

a subsequent determination by the CDC that a temperature of 99.5 was later considered to be a symptom.

127.    But the CDC standard remains at 38 degrees centigrade today (100.4 Fahrenheit) as it was in March 2020.[25]

128.    So widely established is this medical fact that the DC government currently displays placards with the number 100.4 to help people readily identify the actual symptoms of COVID.[26]



*Figure 15 - DC Health Placard on Symptoms of COVID-19 (viewed Mar. 23, 2021)*

129.    Marc followed all medical advice he received. DC health authorities told him to gather telephone numbers for contact tracing purposes, which he promptly did.

130.    He was not told by DC health authorities to contact staff members directly.

---

[25] Centers for Disease Control and Prevention, *Definitions of Symptoms for Reportable Illnesses* (citing 42 CFR parts 70/71.
[26] D.C. Government, Public Resources, *Symptoms of Coronavirus* (viewed Mar. 23, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/Coronavirus-Symptoms-Apr2020_ENG.jpg

131.    As the CDC emphasizes "**Contact tracing is a key strategy to prevent the further spread of COVID-19.**"[27]

132.    And the CDC emphasizes the need to protect the infected patient's identity.

## 2. **Contact tracing:** Public health staff begin contact tracing by notifying exposed individuals (contacts) of their potential exposure as rapidly and sensitively as possible, not revealing the infected patient's identity.



*Figure 16 – Center for Disease Control, Contact Tracing – CDC's Role and Approach (viewed Mar. 28, 202)*

133.    EPIC Board Chair Anita Allen also stated that Marc complied with all medical instructions he received.

134.    The Protocol report that Marc had a temperature of 99.5 also presents a true fact in a false light (implying that this temperature imposed on Marc requirements that he breached), is injurious to Marc, tortious, and actionable as an invasion of privacy.

---

[27] CDC, *Contact Tracing – CDC's Role and* Approach (viewed Apr. 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/contact-tracing-CDC-role-and-approach.pdf

135.    The Protocol's purposeful contortion of that number to generate a "scoop" also undermined public health efforts, pursued by the CDC, DC Health, and other agencies.

136.    The Protocol article further stated he "later told the staff he was already on a plane about to depart for Miami for the weekend. So he scheduled a test for when he returned to D.C. on Monday, March 9."

137.    The article falsely and maliciously suggests that Marc acted contrary to medical advice.  Marc took the test on Monday, following the advice of his doctor, who stated that there was no urgency. On March 6, he was already at the end of the period that created any risk of exposure, following his return from work travel to Northern Italy on February 22.

138.    The Protocol also "reported" that Marc said "I exposed my team to a pandemic, and you might not have a job" in the same meeting.

139.    Again, with an economy of words, The Protocol manages to stuff three false and defamatory statements into one sentence. First, Marc in no way uttered the quote that was attributed to him by The Protocol in the preceding paragraph. Second, Marc did not expose his team to the pandemic. And third, Marc's discussion of EPIC's finances was (1) intended to keep the staff in the loop about the state of the organization, which is a good management practice,[28] and (2) assure staff that there was funding for at least six months, even though there had been a significant downturn in the market and that the annual fundraising dinner would likely be cancelled.

140.    The Protocol falsely reported the opposite point that Marc had made with an unambiguously malicious intent.

---

[28] By way of contrast, two days before Executive Editor Tim Grieve published the article about Marc, Grieve had assured the Protocol staff that "everything was fine." A few days later, he fired nearly half of his reporters.

141.     The Protocol also falsely and maliciously reported that "The idea [of anonymity] is for workplace retaliation. I think that rationale is pretty strained when it's the executive director," said one of the former employees.

142.     Again, on information and belief, Ross, the fired employee, made the foregoing statement to Lapowsky.

143.     It is precisely the obligation of the head of a privacy organization to uphold well-established privacy practices, such as contact-tracing with privacy. To write otherwise is absurd—and in this context—malicious.

144.     The Protocol, again following Ross's (on information and belief, the "former employee" being quoted) instructions, falsely reports, "It rubs us all the wrong way when we see him quoted in the press talking about contact-tracing privacy issues when he's violating the guidelines."

145.     There is no indication that Marc violated any guidelines at any time. The statement is clearly false and defamatory, and in this context—from a fired employee, seeking revenge, "vindictive" as described at the time—is prima facie evidence of malicious intent.

146.     Virtually every sentence in the April 16, 2020 Protocol article is false or misleading.[29]

* * *

147.     On information and belief, many of the statements that appeared in The Protocol were coordinated and promoted by Mary Stone Ross, who had been fired by Marc with the support of the EPIC Executive Committee, for incompetence.

---

[29] See *contra*, *Tah v. Global Witness,* slip op. at 8, No. 19-7132 (D.C. Cir. Mar. 19, 2021) ("Tah and McClain sued Global Witness for defamation and false light invasion of privacy. They dispute none of the facts contained in the report . . .")

148.    A current EPIC senior staff member described the Protocol article as "vindictive" and "unbelievable." The senior staff member said that reading the article made her "raging mad."

149.    Another current EPIC senior staff member wrote, "Just saw the post on Protocol. It is frustrating that someone felt all of these internal details should be published. And I can't imagine how you must feel. Let me know if I can help in any way."

150.    A current member of the EPIC Advisory Board described the Protocol article as "invasive, hostile, and vindictive, and insensitive to the realities of how we handle our health information."

151.    Ross's former supervisor indicated that Ross had also been a source for a disparaging article with the same reporter at The Protocol about the Californians for Consumer Privacy, her former employer. Ross's former supervisor wrote to Marc, "I was sorry to see the article, but not surprised to see the same playbook, wreckage & reporter."

152.    Ross's former supervisor also wrote, "the irony of a 'privacy advocate' disclosing someone's health information for personal gain/retribution is difficult to overstate."

153.    Another former supervisor of Ross commented, "bet you she got fired and is now trying to create smoke."

154.    After the publication of the Protocol article, members of the EPIC Advisory Board expressed concern about Marc's response to the coronavirus, restating the false, defamatory, and malicious statements published by The Protocol.

155.    On April 17, 2020, responding to the concerns of some of the EPIC Advisory Board members, the chair of the EPIC Board of Directors drafted a statement intended for public release. Defending Marc's conduct, she wrote "EPIC's leadership sought to follow the advice of the Center for Disease Control and medical advisors, and fulfilled District of Columbia health

reporting requirements." She further stated that "when collecting information on citizens or tracking their movements there are always serious data protection and human rights principles involved."

156.    On April 17, 2020, one member of the EPIC Advisory Board wrote to Marc, "Stuff like this happens . . . believe me I know . . . and of course those who would be happy to undermine the progressive work we do may use this sort of irresponsible crap to advance their position. . . . My first instinct was to write to the advisory group in support of your character—as I believe you are the most trustworthy and principled person I know."

\* \* \*

157.    In retrospect, the Protocol reporting on EPIC as an organization "in turmoil" was a projection of the far greater turmoil underway at The Protocol.

158.    And it did not escape the attention of the advertising industry. Adweek reported the deep cuts, just "2 months after launching."[30]

---

[30] Sara Jerde, Ad Week, *Tech Site Protocol Goes Through Round of Layoffs 2 Months After Launching,* Apr. 21, 2020, https://www.adweek.com/performance-marketing/tech-site-protocol-goes-through-round-of-layoffs-2-months-after-launching/



Protocol laid off staffers today in response to Covid-19.
*Protocol*



**BY SARA JERDE**    🔒 **PREMIUM**    APRIL 21, 2020

Protocol, the tech site that shares a founder with Politico, laid off 13 staffers today in response to the effects the coronavirus pandemic has had on the business, execs told employees today.

*Figure 17 - Adweeek article on The Protocol (Apr. 21, 2020)*

159.    The contrast between the two organizations in the spring of 2020 is striking.

160.    EPIC was well run and had received many awards for financial accountability, management, and transparency. In the spring of 2020, Marc was effectively managing the

38

organizational and the personal challenges of the pandemic, monitoring his health, supporting staff, pursuing programs, and managing finances and fundraising. At Marc's direction, senior staff was routinely preparing scenario assessments and tracking new financial opportunities, so as to minimize the consequences of the economic downturn associated with the pandemic on the EPIC staff.

161.   Marc offered to cut his salary to avoid staff furloughs and layoffs.

162.   Marc was in frequent contact with the staff and the board of directors, providing accurate, up to date information.

163.   Marc had uncovered a new source of funding for EPIC staff in the recently enacted Paycheck Protection Program.

164.   Marc completed the Paycheck Protection Program application for EPIC on April 5, 2020 to obtain 245,100 to support EPIC staff salaries, during the pandemic.[31]

165.   After Marc sent the confidential statement to the EPIC staff and Board of Directors on March 29, 2020 in which he expressed support for the staff, concerns at EPIC abated.

166.   Marc had numerous positive exchanges with the EPIC staff, the members of the EPIC Board of Directors, and notably with the EPIC Board Chair Anita Allen, who continued to express support for Marc's management of the organization and for future events Marc was planning.

167.   And EPIC's already exceptional program work picked up almost immediately.

---

[31] The CARES Act was enacted on March 27, 2020. Application information became available around March 31, 2020. Marc worked diligently with the EPIC senior staff and the EPIC accountant to ensure that the EPIC application would be among the first applications processed by EPIC's bank. *See generally*, U.S. Dept. of The Treasury, *The CARES Act Provides Assistance to Small Businesses,* "The Paycheck Protection Program is providing small businesses with the resources they need to maintain their payroll, hire back employees who may have been laid off, and cover applicable overhead," https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses

168.    On March 30, 2020 the Department of Justice submitted the complete Mueller Report to federal Judge Reggie B. Walton for in camera review in a case that EPIC had pursued under the Freedom of Information Act.[32] The disclosure was widely viewed as a significant step forward in EPIC v. DOJ, one of the most closely watched open government cases in the country.[33]

# DOJ turns over unredacted Mueller report to judge who questioned Barr's 'credibility'

by Daniel Chaitin, Breaking News Editor & Jerry Dunleavy, Justice Department Reporter | ✉ | March 30, 2020 08:50 PM
| *Updated Mar 30, 2020, 09:40 PM*

*Figure 18 - Washington Examine article about EPIC v.DOJ (Mar. 30, 2020)*

---

[32] EPIC v. Dept. of Justice, 1:2019cv00810, (D.D.C. filed Mar. 22, 2019).
[33] See, e.g, Daniel Chaitin, Breaking News Editor & Jerry Dunleavy, Justice Department Reporter, *DOJ turns over unredacted Mueller report to judge who questioned Barr's 'credibility',* Washington Examiner, Mar. 31, 2020, https://www.washingtonexaminer.com/news/doj-turns-over-unredacted-mueller-report-to-judge-who-questioned-barrs-credibility; Janita Kan, *Justice Department Turns Over Unredacted Mueller Report to Federal Judge,* Epoch Times, Mar. 31, 2020, https://www.theepochtimes.com/justice-department-turns-over-unredacted-mueller-report-to-federal-judge_3292275.html



Former special counsel Robert Mueller testifies before the House Intelligence Committee on July 24, 2019. (Chip Somodevilla/Getty Images)

**US NEWS**

# Justice Department Turns Over Unredacted Mueller Report to Federal Judge

BY JANITA KAN    |    March 31, 2020  Updated: March 31, 2020    **A** **A**        🖶  Print

*Figure 19 – Epoch News article about EPIC's FOIA case to obtain the public release of the Mueller Report (Mar. 31, 2020)*

169.    On April 7, 2020, EPIC received documents in a Freedom of Information Act case the organization was pursuing against the National Security Commission on AI.[34]

---

[34] *EPIC v. NSCAI*, 419 F. Supp. 3d 82 (D.D.C. 2019).

170.    The records included internal correspondence and an unattributed report about China's social scoring, facial recognition tools, and AI-based surveillance. The internal report highlighted the "draconian" consequences of China's AI use but stated that "Mass surveillance is a killer application" for AI and that "having streets carpeted with cameras is good infrastructure for smart cities[.]"

171.    EPIC highlighted this second open government success in a news item posted April 7, 2020, "EPIC v. AI Commission: Internal Report Alludes to 'Mass Surveillance,' 'Streets Carpeted with Cameras.'"

172.    The National Security Commission on AI also became a more transparent and accountable agency following EPIC's efforts in this matter.

173.    On April 8, 2020, the New York Times published an article about an investigation by the New York Attorney General into the business practices of Zoom.[35] EPIC had filed a detailed complaint with the Federal Trade Commission in the summer of 2019, warning of the privacy risks of Zoom.



*Figure 20 – EPIC Complaint, In the Matter of Zoom Video Communications, Inc., Federal Trade Commission (July 11, 2019)*

---

[35] Natasha Singer, Nicole Perlroth and Aaron Krolik, *Zoom Rushes to Improve Privacy for Consumers Flooding Its Service: The features that allowed companies to hop on videoconferences also made it easy for trolls to hijack meetings and harass students,* The New York Times, Apr. 8, 2020, https://www.nytimes.com/2020/04/08/business/zoom-video-privacy-security-coronavirus.html;

# *New York Attorney General Looks Into Zoom's Privacy Practices*

As the videoconferencing platform's popularity has surged, Zoom has scrambled to address a series of data privacy and security problems.



*Figure 21 – New York Times articles about investigation of Zoom by the New York Attorney General, noting the earlier work of EPIC (Apr. 8, 2020)*

174.    The New York Times article highlighted EPIC's earlier successful work at the US Federal Trade Commission, as noted by the New York Attorney General. The New York Times reported, "In its letter last week to Mr. Yuan, the New York attorney general's office noted that Zoom did not address the problem until after the Electronic Privacy Information Center, a public interest research center, filed a complaint about the company with the Federal Trade Commission last year."

175.    Marc posted the New York Times article about the investigation undertaken by the New York Attorney General in the Zoom matter to the EPIC Advisory Board list, and they responded, "Good work!," "Bravo!," "That's pretty fantastic," "You/EPIC are always ahead of the curve, and great trailblazers/leaders – thanks so much, and kudos for the accomplishment and richly-deserve acknowledgment, Marc!" "Three cheers for EPIC!  Once again your team has distinguished itself in the public interest.  Congratulations!"

176.    On April 9, 2020, EPIC scored another victory, when the Ninth Circuit issued an opinion in In re Facebook Inc. Internet Tracking Litigation.[36]

177.    The Ninth Circuit Court held that Facebook users whose privacy was violated by Facebook's tracking of web browsing can bring suit against the social media platform. Chief Judge Sidney Thomas wrote that "Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway."



*Figure 22 – LawStreet story about the outcome in the Facebook Internet Tracking Litigation case in which EPIC had filed an amicus brief (Apr. 10, 2020)*

---

[36] *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589 (2020), *cert denied*, *Facebook, Inc. v. Davis*, 2021 U.S. LEXIS 1480 (U.S., Mar. 22, 2021).

178.    EPIC had filed an amicus brief in that case, with Marc Rotenberg as lead counsel. EPIC explained to the Ninth Circuit that "Facebook's tracking techniques are designed to escape detection, and the company routinely ignores users' privacy protections."

179.    During this time, EPIC also filed an amicus brief in support of certiorari in *LinkedIn Corp. v. hiQ Labs*, seeking to limit "web scaping," which was undermining the privacy of Internet users and contributing to the growing surveillance of Americans by means of facial recognition.[37]

180.    EPIC's amicus brief received favorable coverage by news organizations.



# Privacy Group Urges Supreme Court To Intervene In LinkedIn Scraping Battle

by **Wendy Davis  @wendyndavis**, April 14, 2020

LinkedIn should be allowed to block outside companies like hiQ analytics from scraping users' data, the advocacy group Electronic Privacy Information Center argues in a new filing with the U.S. Supreme Court.

*Figure 23 – DigitalNewsDaily article about EPIC amicus brief in the LinkedIn case*

181.    A former Solicitor General of the United States, who represents LinkedIn in the matter and had approached Marc about filing the amicus in the case, wrote to Marc on April 13, 2020:

---

[37] *LinkedIn Corporation v. hiQ Labs, Inc.*, No. 19-1116 (S. Ct. filed Apr. 13, 2020). *See also*, Kashmir Hill, *Facial Recognition: What Happens When We're Tracked Everywhere We Go?, N.Y. Times,* Mar. 18, 2021, https://www.nytimes.com/interactive/2021/03/18/magazine/facial-recognition-clearview-ai.html

Hey Marc. I just had a chance to read the amicus brief. You and your colleagues have submitted a fantastic piece of advocacy. The brief makes the case for the important privacy implications of the dispute crystal clear. We really appreciate it. If the Court grants review, we hope we can work closely with you to develop these arguments more fully in our briefing.

182.    Marc acknowledged the other EPIC staff members who participated in the amicus. The praise from the former Solicitor General was a wonderful acknowledgement of EPIC's excellent work in April 2020.

183.    During this two week period – prior to the publication of the Protocol article -- the small NGO with less than a dozen staff and in the midst of the pandemic, also produced detailed statements for Congress on Privacy Safeguards for Digital Contact Tracing, filed new FOIA requests concerning census reporting procedure and predictive policing, organized an international declaration that garnered support from several dozen organizations, submitted detailed comments to the U.S. Customs and Border Protection (CBP) in response to a Notice of Proposed Rulemaking that would drastically expand CBP's use of facial recognition at airports and land border crossings, published a comprehensive assessment of privacy legislation pending in the Congress, filed a reply brief for a Supreme Court certiorari petition (*EPIC v. Dept. of Commerce*,[38] regarding the right to obtain privacy impact assessment for federal agency record systems), and organized weekly meetings for the EPIC Advisory Board members to provide updates and receive advice.

184.    During this time period, EPIC received more than 50 favorable news stories in the national media, including the New York Times (2), The Washington Examiner, and The Washington Post (2), and legal publications, including Bloomberg Law (3), Law360 (5), and Law.com.

---

[38] 928 F.3d 95 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 2718 (2020).

185.    EPIC's financial statements, distributed to the Board of Directors on April 15, 2020, reflected the highest net assets in the organization's 25-year history. EPIC's income in the first quarter of 2020 was far ahead of budgeted projections.

186.    By April 16, 2020, the date of the Protocol article, EPIC was riding a string of legal victories and in a strong financial position. The staff was producing excellent work. The board of directors was working closely with Marc on future events. The advisory board members were proud of their affiliation with EPIC.[39]

187.    No one who was familiar with EPIC could have described the organization as "in turmoil."

188.    In a financial report on April 15, 2020 – the day before The Protocol story – Marc reported to the EPIC Board of Directors "Overall, EPIC had a strong first quarter, and survived a market downturn of -20% (S&P 500) . . . EPIC should end 2020 with a net surplus, though both income and expenses will be significantly below projections."

189.    That same week Allbritton and Grieve were about to fire many of the staff at The Protocol, after having assured everyone that "everything was fine."

190.    Grieve's publication of the news reports about Marc and EPIC deflected public attention from The Protocol's ongoing management and staffing unrest during the coronavirus crisis and his concern that he would burn through the 10 million dollars Allbritton had given him to launch the fledgling organization.

---

[39] One distinguished member of the EPIC Advisory Board, a Vice Chancellor for one of the top universities in the county, wrote to the entire EPIC Advisory Board on April 10, 2020, "I want to thank Marc and EPIC for their extraordinary work. I feel proud to be affiliated."

191.    Stories were also emerging about the failure of Grieve's "newsroom reinvention" while at McClatchy.[40]

192.    Tim Grieve, the Executive Editor of The Protocol, did not simply approve publication of the defamatory, false, and malicious article about Marc Rotenberg. On April 16, 2020, the same day that he approved publication of the article, he also personally tweeted from his Twitter account (@timgrieve) the story, the image, and the link.

193.    Grieve added the defamatory, false and malicious statement, "A chief critic of tech's coronavirus tracking went to work and held meetings with employees after his doctor told him to take a COVID-19 test. It came back positive."[41]

194.    On April 21, 2020, the very same day that Executive Editor Tim Grieve was firing nearly half of his reporters, including many of his senior staff, he caused to be published another series of false and defamatory statements about Marc Rotenberg.

195.    The Protocol falsely and maliciously stated that "Marc Rotenberg came to work and held meetings after his doctor directed him to take a test that later came back positive," falsely and maliciously implying that he acted contrary to medical advice.

196.    The Protocol also falsely and maliciously stated that Rotenberg has recently been an "outspoken critic of invasive surveillance efforts to address the spread of COVID-19," falsely and maliciously implying that he was opposed to effective means of tracking COVID.

197.    In fact, in the article cited by The Protocol, Marc made clear the need ensure effective testing.[42]

---

[40] See, e.g., Rowan Moore Gerety, Columbia Journalism Review, *Steadying the Miami Herald newsroom, after cuts and a digital reinvention*, June 8, 2018, https://www.cjr.org/united_states_project/miami-herald-clickchain-jobs.php, discussed *supra*.
[41] *See* https://twitter.com/timgrieve/status/1250974458938040321 (last visited Mar. 30, 2021).
[42]      Marc Rotenberg, president and executive director of the Electronic Privacy Information Center (EPIC), told BuzzFeed News that it's possible to find a solution that protects privacy and prevents the spread of the virus.

198.    The Protocol also falsely and maliciously stated that he did not notify employees of the test results, falsely and maliciously implying that health protocols required this or that Marc was directed to do so by doctors or public health authorities.

199.    The Protocol maliciously and falsely implied that Marc's departure from EPIC was a consequence of his actions during the week of March 12, 2020.

200.    In fact, the proximate cause of Marc's departure was the publication by Tim Grieve of the Protocol article on April 16, 2020.

201.    And POLITICO's subsequent reporting of Marc's departure coincided with the simultaneous firing of nearly half of The Protocol's news staff.

### The POLITICO Article (April 21, 2020) was False and Malicious

202.    On April 21, 2020 POLITICO published an article "Privacy group's chief out amid coronavirus 'uprising'," describing the decision of the EPIC Board of Directors that followed within days of the publication of The Protocol article.

203.    The POLITICO article republished the false, malicious and defamatory statements contained within April 16, 2020 article in The Protocol.

204.    When asked by a POLITICO reporter to comment on the dismissal, Marc was truly shocked. Less than a day earlier he was organizing an agenda and circulating materials for a long-scheduled board meeting.

205.    He responded "The news came as a surprise to me! You should perhaps contact someone on the EPIC Board of Directors regarding the decision."

---

"People like to say, 'well, we need to strike a balance between protecting public health and safeguarding privacy' — but that is genuinely the wrong way to think about it," Rotenberg said. "You really want both. And if you're not getting both, there's a problem with the policy proposal."

Rosie Gray and Caroline Hoskins, *The Coronavirus Pandemic Has Set Off A Massive Expansion Of Government Surveillance. Civil Libertarians Aren't Sure What To Do,* BuzzFeedNews, Mar. 30, 2020, https://www.buzzfeednews.com/article/rosiegray/they-were-opposed-to-government-surveillance-then-the

206.    POLITICO reported that "EPIC did not immediately respond to a request from POLITICO for additional comment on the reasons for Rotenberg's departure."

207.    To this date, EPIC has not provided Marc a reason for his departure.

208.    Although Marc was widely known in the policy world, and had been quoted in thousands of news articles over the years, hardly any news organization—apart from The Protocol and its parent POLITICO—wrote about Tim Grieve's "scoop."

209.    The Protocol is owned by Perpetual Capital Partners,

210.    POLITICIO Publisher Robert Allbritton is the President of Perpetual Capital Partners and the primary financer.

211.    Protocol Executive Editor Tim Grieve is the Vice President of Perpetual Capital Partners.

212.    POLITICO's decision to amplify the defamatory story in The Protocol deflected attention from the chaos underway at the news organizations.

213.    POLITICO's decision to amplify the defamatory story in The Protocol generated private commercial benefit for Allbritton and Grieve, not only as salaried employees of a news organization, but as partners in a private investment firm.

214.    Over time, the scope of Perpetual Capital Partners has moved beyond the media industry. In 2013, the investment firm stated that it will "target investments in the media and communications, distribution, branded products and business services industries."[43]

215.    Perpetual Capital Partners no longer highlights an interest in media and communications companies.

---

[43] See fn. 2, supra.



*Figure 24 – Perpetual Capital Partners, homepage (viewed Mar. 28, 2021)*

**Marc's Actions**

<u>Marc's Background</u>

216.     Throughout his career, Marc Rotenberg has received numerous awards for professional achievement, ethical conduct, and management success.

217.     Marc has served on the faculty of Georgetown Law Center since 1990 and has coauthored three casebooks concerning privacy law (including SOLOVE & ROTENBERG, INFORMATION PRIVACY LAW (Aspen, 1st ed. 2003) and ALLEN & ROTENBERG, PRIVACY LAW AND SOCIETY (West Academic 2016)), and numerous academic articles and reference books (including ten editions of THE PRIVACY LAW SOURCEBOOK: UNITED STATES LAW, INTERNATIONAL LAW AND RECENT DEVELOPMENTS.)

218.     Marc has recently been described by Stavros Lambrinidis, the EU Ambassador to the United States, as a "relentless watchdog for freedom, a constant source of advice and inspiration."

51

219. Marc received the Norbert Weiner Award for professional and social responsibility and was named to receive the ACM Award for Public Policy, a top honor in the field of computer science, until the publication of The Protocol article.

220. Marc has testified before the US Congress on more than 60 occasions, authored more than 100 amicus briefs for federal and state courts, and initiated hundreds of comments to federal agencies, including complaints to the Federal Trade Commission that led to settlements with Amazon, Google, Facebook, Uber, and others.

221. At the time of Marc's unlawful dismissal, he was in the midst of high-level cases concerning the public release of the Mueller report regarding Russian interference in the 2016 Presidential election, Eric Schmidt's role as Chair of the National Security Commission on Artificial Intelligence, the public release of the then-President Trump's tax returns, legal fees arising from a successful Freedom of Information Act case regarding the nomination of Brett Kavanaugh to the US Supreme Court, and other similar matters.

222. Marc was also leading international efforts to promote human rights standards for the deployment of artificial intelligence.

223. Marc was well known for thoughtful approaches to complex problems involving law and technology. Marc worked closely with distinguished experts in law, technology, and public policy (members of the EPIC Advisory Board), seeking to find the most well-informed, evidence-based solutions to pressing policy problems.

224. EPIC's Advisory Board, typically identified and proposed by Marc, included winners of the Turing Award (the highest award in computer science), the MacArthur "Genius" Award, the ABA Thurgood Marshall Award, and many other similar distinctions.

225.    Founded as an organization to safeguard the right of privacy in the modern age, EPIC as an organization—and its members—are committed to privacy protection, particularly for sensitive medical information.

226.    At the time of Marc's unlawful dismissal, many members of the EPIC Advisory Board were themselves developing and reviewing proposals to permit contact tracing while safeguarding privacy, a central objective for an organization founded to promote privacy protection and "focus public attention on emerging privacy issues."

227.    In testimony before Congress, in amicus briefs for federal and state courts, in academic articles, and public speeches going back more than 30 years, Marc has routinely argued for methods and techniques that safeguard personal privacy while addressing public concerns.[44]

228.    Marc's views on privacy and medical information are widely reflected in public health standards in the United States and other democratic countries.

229.    The Centers for Disease Control ("CDC"), the D.C. Health Agency, and the Occupational Safety and Health Administration ("OSHA"), among others, seek to ensure the privacy of sensitive medical information.

230.    In addition to his accomplishments as one of the nation's leading privacy experts and advocates, as a manager Marc has routinely received top evaluations from the EPIC Board of Directors, independent rating agencies for non-profit organizations, and leading experts in business management.

---

[44] See, e.g., *EPIC Amicus Brief, Bureau of Alcohol, Tobacco, and Firearms (BATF) v. City of Chicago*, No. 02-322 (US 2002) ("EPIC believes that it was the intent of Congress to maximize both the public's access to government information and to safeguard personal privacy to the greatest extent feasible. . . . In those cases where the Court is asked to consider how to reconcile competing privacy and open government claims, EPIC urges the adoption of policies and techniques that safeguard both interests."), http://www.epic.org/privacy/chicago/epic_amicus.pdf

231.    Marc was one of the few non-profit leaders in the United States routinely invited to the Yale CEO Forum, organized by the Yale School of Management, a gathering of top private sector CEOs. The Yale CEO Forum emphasizes the importance of personal integrity and transparency when confronted with a crisis.

232.    On March 10, 2021, Dr. Anthony Fauci received the Legend in Leadership Award at the meeting of the Yale CEO Forum.

233.    Marc also built a reputation for professional integrity and honesty, receiving among other awards, the Norbert Weiner Award for social and professional responsibility.

**Marc's Performance During the "Crisis"**

234.    Even with Ross stirring up controversy, undermining the work of EPIC, and trying to force Marc out of the organization, Marc continued to perform at a high level, promoting EPIC's program and litigation activities, obtaining grants, speaking at conferences, managing administrative responsibilities, and pursuing the mission of the organization.

235.    Contrary to the report that appeared in the Protocol, from March 12 through April 21, Marc effectively managed the work of EPIC, supported and encouraged the EPIC staff members, and fulfilled all commitments to the organization.

236.    Marc also led a new effort to refocus EPIC's program activity on the challenges associated with contact tracing, surveillance, and privacy protection, activities that members of the EPIC Advisory Board had identified as key priorities.

237.    Among many other activities, Marc also spoke at an international panel with global privacy experts about privacy and the response to the pandemic, organized by the OECD, in April 2020.

238.    Marc also proposed to organize a virtual seminar on privacy and the pandemic in conjunction with the annual June dinner.

239.    The level of activity of the organization during this period, March 12 to April 21, as measured by the number of News Items on the EPIC homepage, increased over other similar periods. There were 77 items posted to the EPIC homepage.

240.    At all times, Marc acted responsibly, diligently, and in accordance with the advice he received from his physician and D.C. Health authorities.

241.    At no time did Marc ever knowingly put anyone at risk.

242.    Marc's conduct only came into question because he was *overly cautious* with regard to an email he received from Georgetown University.

243.    Marc believed that he was required to self-quarantine when he was not.

244.    Marc subsequently clarified this point with both the EPIC staff and the EPIC Board of Directors.

245.    The EPIC Board of Directors understood the mistake.  The EPIC Board Chair Anita Allen acknowledged that Marc had followed the medical advice he received.

246.    But Ross, in collaboration with Tim Grieve at The Protocol, purposefully and maliciously lied about this key fact damaging both Marc and EPIC.

247.    And the damage to EPIC has been substantial.

248.    In the eleven months since the publication of The Protocol and POLITICO articles, and the dismissal of Marc, the level of activity at EPIC has fallen off precipitously. As objectively measured against any similar time period in EPIC's 25-year history, the organization has never been less productive, less effective, or less able to pursue the mission for which it was established.

249.    The Protocol, itself in turmoil when it chose to write the defamatory story about Marc, is directly responsible for the dismissal of Marc and the downturn that followed at EPIC.

## Evaluation of the EPIC Executive Director and Marc's Job Performance

250.    Under Marc's leadership EPIC has routinely received top management evaluations from the leading evaluators of non-profit organizations.

251.    In 2020, when Marc was EPIC's President and Executive Director, EPIC received "Four Stars" from Charity Navigator, including a 100% score for "financial," a 96% score for "accountability and transparency," and a 97% score "overall,"  and a "Gold" rating from Guidestar ("Gold").

252.    Charity Navigator is the largest expert charity evaluator in America.

253.    2020 marked the fourth consecutive year that EPIC received the four-star rating from Charity Navigator.

254.    According to Charity Navigator, "This is our highest possible rating and indicates that your organization adheres to sector best practices and executes its mission in a financially efficient way."

255.    GuideStar is the world's largest source of nonprofit information,

256.    2020 marked the fourth consecutive year EPIC received the Gold rating from Charity Navigator.

257.    Marc has routinely received top performance evaluations from the EPIC Board of Directors.

258.    In 2017, 2018, 2019, and 2020, Marc routinely received "exceeds expectations" for the annual performance evaluation in all four core areas of responsibility.

259.    Marc's outstanding performance was reflected in the bonus award approved by the EPIC Board of Directors following the annual review.

260.    Marc never received an evaluation for any activity below "meets expectations."

261.    The EPIC Board of Directors has never documented a single activity where Marc has failed to meet expectations.

## Action Against EPIC

262.    After the publication of The Protocol article that led to the dismissal of Marc Rotenberg from EPIC, Marc sought to resolve the dispute with EPIC without resort to litigation and proposed several outcomes, including reinstatement.

263.    As long as The Protocol and the POLITICO articles were publicly available, Marc was unable to reach a reasonable resolution with EPIC.

264.    On June 25, 2020, Marc Rotenberg filed a lawsuit against EPIC, the organization he founded, for violations of the D.C. Human Rights Act, Breach of Contract / Breach of Implied Contract, Defamation, Invasion of Privacy, Breach of Confidential Relationship, and Intentional Infliction of Emotional Distress.

265.    Marc Rotenberg settled the case against EPIC in October 2020.[45]

### Efforts to Resolve the Dispute with POLITICO without Resort to Litigation

266.    Marc Rotenberg wrote to POLITICO CEO on December 31, 2020 in an attempt to resolve the dispute with POLITICO and avoid litigation.

267.    The letter was sent by certified mail, return receipt.

268.    As Marc explained in the letter, the article published in The Protocol, "and the subsequent reporting in POLITICO led to my dismissal from an organization I founded and built

---

[45] *Rotenberg v. EPIC*, 2020-CA-002895 (D.C. Sup. Ct., filed June 25, 2020)

over 25 years, an organization known for integrity and honesty, closely tied to my personal reputation."

269.    Marc recounts the outcome of the case with EPIC and wrote to the POLITICO CEO, "I simultaneously went about the work of rebuilding my career and my reputation. . . . As the end of year approaches, I am proud of my accomplishments and the support of my family and close friends after the devastating article you published. But still there are many people who know me only through the stories in The Protocol and POLITICO."

270.    Marc wrote "So, one issue has remained with me throughout the year, and I cannot leave it unresolved: whether to file a defamation lawsuit against POLITICO. That is the reason for this letter now."

271.    On this issue, Marc wrote "I would avoid a lawsuit against a news organization if there is a better alternative." He summarizes a distinguished career as an open government litigator and a First Amendment advocate, noting that he had defended the free speech rights of Nazis, while simultaneously leading a Jewish youth organization, and gave a Champion of Freedom award to the controversial whistleblower Edward Snowden. He writes, "Intellectual freedom is the cornerstone of my world view."

272.    He even expresses support for the reporter who wrote the defamatory article in The Protocol. "She has written many excellent articles . . . . It is ultimately the responsibility of the news company to oversee the articles it chooses to publish."

273.    He goes on to say "But your company crossed a line. I was defamed. I suffered harms, and a very good (and very principled) organization is now in tatters."

274.    Marc then recalled an event, in which he participated, with Arthur Ashe and the American Society of Newspaper Editors, that occurred after *USA Today* published an article about Mr. Ashe and his HIV status.

275.    The USA Today article about Mr. Ashe's medical diagnosis provoked widespread concern among news organizations and editors.[46]

276.    Marc wrote to Mr. Steel, "Mr. Ashe was not seeking compensation for himself and he believed in the importance of the press. He also believed that news organizations should learn from the experience. It was a thoughtful and forward-looking approach."

277.    Marc proposed a resolution of the matter that included an admission and correction by POLITICO, training of journalists to prevent similar problems in the future, and a contribution by POLITICO to support scholastic chess programs in Washington, DC.

278.    Marc did not seek any monetary reward for himself.

279.    Until POLITICO was contacted by undersigned counsel months later, Mr. Steel never bothered to respond to Marc's letter.

**Allbritton's Performance During the Crisis**

280.    The articles by Protocol and POLITICO maliciously charged that Marc had acted with disregard for his staff during the early days of the pandemic.

281.    The Protocol further falsely stated that Marc had created problems for the staff by describing the financial circumstances at EPIC.

---

[46] See, e.g., Alex S. Jones, *News Media Torn Two Ways in Debate on Privacy, New York Times, Apr. 30, 1992,* ("It is not easy for the nation's editors to reconcile the twin American passions for both information -- including quantities of gossip -- and privacy.") https://www.nytimes.com/1992/04/30/us/news-media-torn-two-ways-in-debate-on-privacy.html

282.     As Lapowsky reports, in words likely dictated by Mary Stone Ross, "It was, 'I exposed my team to a pandemic, and you might not have a job' in the same meeting," the former employee said. "Pretty rough."

283.     These charges regarding Marc are all the more remarkable in light of the conduct of Protocol Editor Tim Grieve, as detailed above, and POLITICO publisher Robert Allbritton.

284.     On April 21, 2020, the very same day that both the Protocol and PROTOCOL were reporting on the dismissal of Marc Rotenberg from EPIC, an event engineered by the Protocol's own reporting, Robert Allbritton the publisher of POLITICO and the owner of The Protocol wrote a memo to POLITICO staff about his handling of the Coronavirus crisis.



*Figure 25 - Robert Allbritton, POLITICO Publisher / Protocol owner, memo to POLITICO staff (Apr. 21, 2020)*

285.    Describing the coronavirus pandemic as a "crisis affecting everyone and everything," Allbritton wrote that the team "hired ambitiously" at The Protocol.

286.    But then he explains that "the leadership team at Protocol and I have been focused on how the pandemic disruption affects our strategy." In his words: "In short, it does not change our goals but does require responsible adjustment on our timeline for meeting them. Protocol has therefore made a difficult but necessary decision to reduce near-term costs until a more robust revenue pipeline resumes."

287.    Allbritton then writes, "I'm sure you have questions. I hope I can try to alleviate some anxieties and provide you with candid and direction information" one week after he and Grieve had assured the reporters at The Protocol that "everything was fine."

288.    On April 21, 2020, while POLITICO and Protocol published malicious headlines and articles about Marc Rotenberg, a widely respected leader of an influential Washington non-profit organization, Robert Allbritton, the publisher of POLITICO, and Tim Grieve, the Executive Editor of The Protocol, fired nearly half the staff of The Protocol in the midst of a global pandemic.

## COUNT I
## Defamation by the Protocol

289.    Marc Rotenberg hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

290.    "In a defamation by implication case under D.C. law, 'the courts are charged with the responsibility of determining whether a challenged statement is capable of conveying a defamatory meaning.'"[47]

---

[47] *Tah v. Global Witness,* slip op. at 11, No. 19-7132 (D.C. Cir. Mar. 19, 2021), citing *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).

291.    As the D.C. Circuit has recently explained, "A plaintiff must show first that the 'communication, viewed in its entire context, . . . conveys materially true facts from which a defamatory inference can reasonably be drawn,'" and second, that "'the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference.'"[48]

292.    POLITICO and The Protocol, the company owned by the publisher of POLITICO, repeatedly published false and malicious statements about Marc Rotenberg on April 16, 2020, and twice on April 21, 2020.

293.    The articles were malicious by intent, design, and consequence.

294.    The Protocol articles, published on April 16 and 21, 2020, contained sensitive medical information known only to the EPIC Board of Directors and the EPIC Staff.

295.    The Protocol articles presented facts in a false light from which adverse inferences were intended.

296.    The Protocol articles were false, defamatory, malicious, and an invasion of privacy.

297.    The Protocol articles falsely and maliciously stated that Marc "acknowledged in a memo to his staff and his board that he should have quarantined and alerted his staff that he was taking a coronavirus test."

298.    The Protocol articles falsely and maliciously suggested that Marc's action "undermined their organization's resistance to invasive coronavirus surveillance."

---

[48] Id., citing *Armstrong v. Thompson*, 80 A.3d 177, 184 (D.C. 2013) (emphasis omitted) (quoting *White*, 909 F.2d at 520).

299.   The Protocol articles falsely and maliciously suggested that Marc ignored medical advice.

300.   The Protocol articles falsely and maliciously suggested that it is contrary to the purpose of a privacy organization to safeguard privacy.

301.   The Protocol articles falsely and maliciously suggested that multiple employees had resigned relating to the events falsely described in the article when, in fact, the single employee who resigned during the relevant timeframe did so for unrelated reasons.

302.   The Protocol articles injured Marc "in his trade, profession [and] community standing," and  "lowered him in the estimation of the community" and constitute defamation.[49]

303.   The Protocol has committed multiple acts of defamation.[50]

304.   Marc Rotenberg was the subject of multiple false and defamatory statements.

305.   The Protocol published the statements to a third party.

306.   The Protocol acted with reckless disregard of the falsity of the statements.

307.   The Protocol also must have entertained serious doubts as to the truth of the allegations.[51]

308.   The Protocol had obvious reason to doubt the veracity of the source.[52]

309.   The Protocol piled malicious characterizations atop malicious statements.

310.   Marc Rotenberg and his family suffered actual harm following directly from the acts of Defendants. He was fired within days after the April 16, 2020 Protocol article was

---

[49] *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990); *Nyambal v. AlliedBarton Sec. Servs.,* LLC, 344 F. Supp. 3d 183, 190 (D.D.C. 2018)].
[50]  "To state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 272 (D.D.C. 2017) (Judge Ketanji Brown Jackson) citing *Farah v. Esquire Magazine*, 736 F.3d 528, 533-34, 407 U.S. App. D.C. 208 (D.C. Cir. 2013).
[51] *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).
[52] *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1507 (D.C. Cir. 1996).

published. A prestigious award to Marc, from a leading scientific society, was also withdrawn as a consequence of the Protocol article.

## Count II
## Defamation by POLITICO

311.    Marc Rotenberg hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein

312.    An article that appeared in POLITICO on April 21, 2020 republished the false, defamatory, and malicious statements that appeared in the April 16, 2020 Protocol article.

313.    The April 21, 2020 POLITICO article falsely and maliciously stated that Marc "later acknowledged to staff in a memo that he should have notified them of the test instead of continuing to work, according to the report."

314.    The republication of a defamatory statement is itself defamatory. Moreover, the republication by POLITICO was purposefully intended to amplify the commercial value of the article in The Protocol, a news organization owned by Perpetual Capital Partners, a private investment firm in which both Allbritton and Grieve participated.

315.    The POLITICO article also made the false, defamatory and malicious statement that "Marc Rotenberg has been a leading critic of Silicon Valley's efforts to track the spread of Covid-19."

316.    POLITICO has committed multiple acts of defamation.[53]

317.    Marc Rotenberg was the subject of multiple false and defamatory statements.

318.    POLITICO published the statements to a third party.

---

[53] *Zimmerman v. Al Jazeera Am.*, LLC, 246 F. Supp. 3d 257, 272 (D.D.C. 2017) (Judge Ketanji Brown Jackson) citing *Farah v. Esquire Magazine*, 736 F.3d 528, 533-34, 407 U.S. App. D.C. 208 (D.C. Cir. 2013).]

319.     POLITICO acted with reckless disregard of the falsity of the statements and with malicious intent.

320.     Marc Rotenberg suffered actual harm. POLITICO injured Marc "in his trade, profession [and] community standing," and "lowered him in the estimation of the community" and constitute defamation.[54]

## Count III
## Invasions of Privacy by The Protocol / False Light

321.     Marc Rotenberg hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

322.     "The District of Columbia has long recognized the common law tort of invasion of privacy."[55]

323.     The District of Columbia "has relied on the RESTATEMENT'S (SECOND) formulation of the law applicable to 'invasion of privacy' in determining the appropriate contours of a cause of action for invasion of that right."[56]

324.     "The RESTATEMENT, supra, § 652D, recognizes that publicity of a private matter may constitute an invasion of privacy. . . . The determinative factor is whether the communication is public as opposed to private."[57]

325.     In the District of Columbia, "a cause of action for the invasion of privacy 'represents a vindication of the right of private personality and emotional security.'"[58]

---

[54] *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990); *Nyambal v. AlliedBarton Sec. Servs.*, LLC, 344 F. Supp. 3d 183, 190 (D.D.C. 2018)].
[55] *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 587 (1985).
[56] *Id.*
[57] *Id.*
[58] *Id.*

326.    The Protocol caused to be published private medical facts, the disclosure of which would be highly offensive to a reasonable person.

327.    "A defamation tort redresses damage to *reputation*," while "a false light privacy tort redresses *mental distress* from having been exposed to public view."[59]

328.    Under "District of Columbia law, '[a] false light claim . . . requires a showing of: (1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person.'"[60]

329.    The Protocol caused to be published facts in a false light that were disparaging, as follows:

   a.  The Protocol published these statements.

   b.  The Protocol  made false statements, representations, or imputations.

   c.  The statements concerned Marc.

   d.  The statements cast Marc in a false light and would be offensive to a reasonable person.

330.    The Protocol has invaded Marc's privacy for both public disclosure of privacy facts and false light and is subject to damages for both acts.

## COUNT IV
### Invasion of Privacy by The Protocol / Public Disclosure of Private Facts

331.    Marc Rotenberg hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

---

[59] *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp 36, 62
[60] *Zimmerman,* 246 F.Supp at 272, citing *Doe v. Bernabei & Wachtel, PLLC,* 116 A.3d 1262, 1267 (D.C. 2015) (denying motion to dismiss)

332.    The Protocol chose to make public the confidential medical diagnosis of Marc Rotenberg.

333.    The publication of an individual's medical status was at the time, and remains to this day, contrary to medical practice, and the recommendations of the Center for Disease Control, the World Health Organization, the D.C. Health Agency, the President's Coronavirus Response Coordinator, and the workplace guidelines of the Occupational Safety and Health Administration for safe and healthy working conditions.

334.    The Center for Disease Control has made clear the need to protect patient identity to facilitate contact tracing. Under the heading "Certain core principles of case investigation and contact tracing must always be adhered to," the CDC states "To protect patient privacy, contacts are only informed that they may have been exposed to a patient with the infection. They are not told the identity of the patient who may have exposed them."[61]

335.    The World Health Organization, in conjunction with many leading agencies within the United Nations, issued a sweeping joint statement on Data Protection and Privacy in the COVID-19 Response.[62]

336.    The UN statement built on earlier guidance from the World Health Organization which emphasized the importance of privacy protection.[63]

337.    As the World Health Organization explained in May 2020 (echoing points Marc had made throughout his career in testimony before Congress, appellate briefs, and public lectures,

---

[61] Centers for Disease Control, *Case investigation and Contact Tracing, Part of a Multi-Pronged Approach to Fight the COVID-19 Pandemic*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/principles-contact-tracing-booklet.pdf

[62] World Health Organization, *Joint Statement on Data Protection and Privacy in the COVID-19 Response* (Nov. 19, 2020), https://www.who.int/news/item/19-11-2020-joint-statement-on-data-protection-and-privacy-in-the-covid-19-response

[63] World Health Organization, *Ethical considerations to guide the use of digital proximity tracking technologies for COVID-19 contact tracing* (May 28. 2020) (Interim guidance), https://www.who.int/publications/i/item/WHO-2019-nCoV-Ethics_Contact_tracing_apps-2020.1

described above), "Member States can achieve their public health objectives while protecting fundamental rights, such as privacy, at the same time."[64]



   Health Topics ⌄   Countries ⌄   Newsroom ⌄   Emergencies ⌄

Home / News / Joint Statement on Data Protection and Privacy in the COVID-19 Response

# Joint Statement on Data Protection and Privacy in the COVID-19 Response

19 November 2020 | Statement | Reading time: 3 min (704 words)

*The United Nations, IOM, ITU, OCHA, OHCHR, UNDP, UNEP, UNESCO, UNHCR, UNICEF, UNOPS, UPU, UN Volunteers, UN Women, WFP and WHO support the adoption of the following joint statement, in line with the UN Personal Data Protection and Privacy Principles  adopted by the UN System Organizations to support its use of data and technology in the COVID-19 response in a way that respects the right to privacy and other human rights and promotes economic and social development.*

*Figure 26 – United Nations Joint Statement on Data Protection and Privacy in the COVID=19 Response (Nov. 19, 2020)*

---

[64] Id. at 1-2.

338.    The UN statement repeatedly emphasized the need to protect privacy in the battle

against COVID:

> Any data collection, use and processing by UN System Organizations in the context
> of the COVID-19 pandemic should be rooted in human rights and implemented
> with due regard to applicable international law, data protection and privacy
> principles, including the UN Personal Data Protection and Privacy Principles.

339.    Privacy safeguards for pandemic responses were also well known in the United

States. A widely available non-profit guide to workplace safety, based on the federal Occupational

Safety and Health Act of 1970 (OSHA), states:

> Employers have a duty of care to their employees, and thus may be required to
> provide employees with information on the spread of a pandemic illness, take
> protective measures against the spread of the contagion, and provide warning if
> employees may have been exposed to someone diagnosed with the disease (*but not
> identifying that individual*).[65]

340.    On October 19, 2020, the DC government launched the DC COVID Alert Notice

(DC CAN), an app to "help residents know if they may have been exposed to COVID-19."[66] The

app was developed to help encourage public participation.

341.    Privacy of contact tracing information is central to the design of the DC contract

tracing app. The DC government emphasized that "persons who test positive ***are not identified*** by

the system to other users . . ." (emphasis in original).

---

[65] Pro Bono Partnership, *A Nonprofits Guide to OSHA 28* (July 2016) ("Communicable or Pandemic Diseases")
(emphasis added), https://www.probonopartner.org/wp-content/uploads/2016/07/OSHAGuide.pdf
[66] Mayor Muriel Bowser, *Coronanvirus, Situational Updates* (Oct. 19, 2021),
https://mayor.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Situational_Update_Presentati
on_10_19_2020.pdf



*Figure 27 - DC Health agency statement on contract tracing and privacy*

342.    Current practices for the DC government continue to protect the identity of a person

who has tested positive from COVID from other employees. The current guidance from the DC

Health agency for "Employers when Employees Test Positive for COVID-19" states emphatically

that employers should not disclose the identity of the employee who tested positive.[67]



o   DC Health will contact the **business** and the positive **employee**. The positive
    employee may receive calls from both the <u>DC Contact Trace Force</u> and the
    epidemiology team.

•   Employers must **notify other employees** about the positive COVID-19 case at the
    business. **The notification must <u>not</u> identify the COVID-19 positive employee.** The

*Figure 28 - DC Health agency statement on employee notification and protection of identity*
*(Nov. 20, 2020)*

---

[67] D.C. Health, *Phase Two Guidance: Coronavirus 2019 (COVID-19): First Steps for Non-Healthcare Employers
when Employees Test Positive for COVID-19,* Nov. 20, 2020,
https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/First-Steps-for-Non-Healthcare-Employers_COVID-19-DC-Health-Guidance.pdf

343.    Then-Presidential candidate Joe Biden, informed by the world's leading experts in infectious disease, wrote in The New York Times the very same week as The Protocol article critical of Marc Rotenberg for following the procedures for contract tracing, "there needs to be widespread, easily available and prompt testing—*and a contact tracing strategy that protects privacy.*" (emphasis added)

344.    And Mr. Jeffrey Zeintz, the President's Coronavirus Response Coordinator, emphasized the importance of privacy protection in a White House press briefing with Dr. Anthony Fauci just a few weeks ago.[68]

345.    Mr. Zeintz stated, "Our role is to help ensure that any solutions in this area should be simple, free, open source, accessible to people both digitally and on paper, and designed from the start to protect people's privacy."[69]

BRIEFING ROOM

# Press Briefing by White House COVID-19 Response Team and Public Health Officials

MARCH 12, 2021  •  PRESS BRIEFINGS

Via Teleconference

11:18 A.M. EST

MR. ZIENTS:  Thank you everybody for joining us today. Today, we will get a state-of-the-pandemic update from Dr. Walensky. Dr. Fauci will highlight the latest science, and Dr. Nunez-Smith will discuss our focus on equity.

*Figure 29 – Press Briefing by White House COVID-19 Response Team and Public Health Officials (Mar. 12, 2021)*

---

[68] The White House, *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, (Mar. 12, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/12/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-14/

[69] *Id.*

346.    Neither The Protocol's reporter Issie Lapowsky nor The Protocol's Executive Editor Tim Grieve made any attempt to determine whether Marc's conduct was contrary to medical practices. Not a single expert was asked whether it would be consistent with medical practices for a person who received a positive test for COVID to make public that fact.

347.    A simple Internet search for "contact tracing" and "privacy" would have quickly made clear that Marc did precisely what he was supposed to do, contrary to The Protocol's reporting.

348.    The Protocol had constructed a 'house of cards," an 'inherently implausible story" that Marc acted without regard to medical advice, that Marc believed that "privacy trumped surveillance," and that EPIC was in "turmoil."

349.    To characterize Marc's conduct as The Protocol did required total disregard of the relevant scientific and medical information.

350.    The publication of a particular person's confidential medical condition with the intent to injure or cause harm to that person would be highly offensive to a reasonable person.

351.    The Protocol's reckless disregard for the best practices for the protection of sensitive medical data is reprehensible[70] and would discourage many from attempting to comply with public safety initiatives underway across the country to battle the pandemic.[71]

---

[70] "[P]eople have moral obligation not make gratuitous, cruel, unconsented-to disclosures about others." Anita L. Allen, *An Ethical Duty to Protect One's Own Information Privacy?,* 64 Ala. L. Rev. 845, 849 (2013)

[71] American Medical Association, *Code of Medical Ethics: Privacy, confidentiality & medical records*, "Protecting information gathered in association with the care of the patient is a core value in health care." https://www.ama-assn.org/delivering-care/ethics/code-medical-ethics-privacy-confidentiality-medical-records

## COUNT V
## Unjust Enrichment / Tort of Appropriation

352.     Marc Rotenberg hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

353.     POLITICO and Robert Allbritton, as publisher of POLITICO, owner of The Protocol, and President of Perpetual Capital Partners, obtains commercial value every time a person clicks on the false and defamatory stories concerning Marc Rotenberg.

354.      In the absence of action by this Court, Robert Allbritton will continue to derive commercial benefit from the publication of content that is defamatory, false and malicious.

355.     This standard allows publishers to obtain private commercial benefit from articles they choose to publish that includes disinformation, revenge porn, hate speech, propaganda, and statements that seek to destabilize American democracy.

356.     The Internet advertising model—the "reinvention of the newsroom" —has coarsened political debate, contributed to political polarization, mocked science and evidence-based analysis, and diminished the value of news.  It has imposed specific costs on individuals and organizations who are the targets of this reckless form of journalism.

357.     Regarding the privacy debate in America, The Protocol and POLITICO's reckless disregard of well-known medical and scientific practices has undermined—and continues to undermine—thoughtful, well-reasoned approaches to emerging challenges.

358.     The Protocol and POLITICO's vicious and reckless reporting about Marc Rotenberg, the former leader of EPIC, has also chilled conversations and public statements about

effective privacy responses to the pandemic. Since The Protocol and POLITICO articles, EPIC itself has ceased reporting on privacy recommendations from the World Health Organization.[72]

359.   Not all of these harms can be remedied in this proceeding, but to the extent that a news organization, with reckless disregard of the truth, seeks to "drive digital engagement" with a "strong personality element," the law recognizes the commercial dimension of the harm.

360.   Merriam-Webster describes unjust enrichment as "(1) the retaining of a benefit (as money) conferred by another when principles of equity and justice call for restitution to the other party; (2) a doctrine that requires an equitable remedy on behalf of one who has been injured by the unjust enrichment of another."

361.   Appropriation is the use of a person's name or likeness for commercial benefit without their consent.

362.   The District of Columbia has adopted the definition set forth by the Restatement (Second) of Torts § 652C for . . . the tort of misappropriation of name .[73]

363.   One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.[74]

364.   The public figure doctrine emerged in an era prior to the Internet advertising model that rewards news organizations for the ongoing display of defamatory content.

365.   POLITICO and The Protocol should not continue to profit from the defamatory use of a person's name and likeness.

---

[72] See, e.g., EPIC, *World Health Organization Again Speaks Up for Data Protection* (Mar. 27, 2021), https://epic.org/2020/03/world-health-organization-agai.html.
[73]   *Doe v. Bernabei* & *Wachtel*, PLLC, 116 A.3d 1262 (D.C. App. 2015) citing *Teltschik v. Williams & Jensen, PLLC,* 683 F. Supp. 2d 33, 55 (D.D.C. 2010); see also *Vassiliades*, 492 A.2d at 592-93.
[74] Restatement (Second) Of Torts § 652C (1977).

**Prayer for Relief**

366.    Plaintiff Marc Rotenberg respectfully requests that the Court enter judgment in his favor and award to him the following relief:

a.  Injunctive relief concerning POLITICO that requires: (1) an update, on the same web page as the April 21, 2020 article, that reports on the subsequent legal action against EPIC for defamation, violation of the DC Human Rights Act, and related claims; (2) an update, on the same page as the April 21, 2020 article, that reports on the subsequent legal action against POLITICO for defamation, false light privacy tort, public disclosure of private facts, and  commercial appropriation of name and likeness; and (3) a correction to the headline of the April 21, 2020 article that makes clear that Marc never opposed COVID tracking;

b.   Injunctive relief concerning The Protocol that requires (1) the removal and take down of the April 16, 2020 article, (2) the removal and take down of the April 21, 2020 article, and (3) a request from The Protocol Executive Editor Tim Grieve to Google that both articles be delinked in all search engines that Google operates

c.  Compensatory damages for lost wages and other income, including awards and honoraria, and reputational harm in the amount of one million dollars;

d.  The charitable contributions by Defendants of one million dollars to ChessGirlsDC and one million dollars to the US Chess Center, to support scholastic chess in Washington, DC;

e.  Reasonable attorneys' fees and costs of this action; and

f.  Any other relief this Court deems just and proper to award.

Dated: April 2, 2020

Respectfully submitted,

IFRAH PLLC

By: */s/ Jeff Ifrah*
A. Jeff Ifrah (D.C. Bar No. 456661)
E-mail: jeff@ifrahlaw.com
1717 Pennsylvania Ave., NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 524-4140
Facsimile: (202) 524-4141

*Attorneys for Plaintiff Marc Rotenberg*